UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * *
Thomas J. Murray, Jr., and          *
Lynn M. Murray, on their own behalf and  *    Case No. 20-cv-
on behalf of their minor child, C.M.,   *
                                    *
              Plaintiffs,           *
                                    *
v.                                  *
                                    *
Town of Windham, and                *
Al Letizio,                         *
              Defendants.           *
* * * * * * * * * * * * * * * * * *
```

COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF, AND DAMAGES

NOW COME the Plaintiffs, Thomas J. Murray, Jr., and Lynn M. Murray, on their own behalf, and on behalf of their minor child, C.M., and allege as follows:

Introduction

1. The Plaintiffs commence this action pursuant to Title II (Part A) and Title V of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.* and § 12201 *et seq.*, and its implementing regulations, 28 C.F.R. Part 35, against the Defendants for discriminating against C.M. on the basis of his disability.

2. The Defendant, Town of Windham, acting through its agents, including without limitation, Board of Selectmen, Chief of Police, Town Administrator, and Director of Public Works, caused to be removed and relocated a "Special Needs Resident" sign at the request of the Defendant Al Letizio, which sign had previously been installed by the Town for the protection of C.M.

3. The Plaintiffs seek a declaratory ruling that the Defendants' actions violated the ADA, a permanent injunction ordering the installation of an ADA compliant sign be installed in the sign's original location, and damages, including compensatory and punitive damages, and attorney fees

and costs. The Plaintiffs further seek an order from this Court compelling the Defendant Town of Windham to adopt ADA compliant policies and procedures, including a grievance procedure, and to provide ADA training and education to its officials, including without limitation, Board of Selectmen, Chief of Police, Town Administrator, and Director of Public Works.

Parties

4.      The Plaintiffs, Thomas J. Murray, Jr., Lynn M. Murray (collectively "Murrays"), and C.M., are individuals and residents of the Town of Windham, with an address of 29 West Shore Road, Windham, New Hampshire 03087. The Plaintiffs, Thomas J. Murray, Jr. and Lynn M. Murray, are the parents of C.M., a minor, and bring this action on their own behalf, and on behalf of C.M.

5.      The Defendant, Town of Windham, is a New Hampshire municipal corporation, with a principal address of 4 North Lowell Road, Windham, New Hampshire 03087.

6.      The Defendant, Al Letizio, is an individual and a resident of the Town of Windham, with an address of 22 West Shore Road, Windham, New Hampshire 03087.

Jurisdiction and Venue

7.      The Court has federal question subject matter jurisdiction pursuant to 42 U.S.C. §§ 12133 and 12203 (c) and 28 U.S.C. § 1331.

8.      Venue is proper in the District of New Hampshire pursuant to 42 U.S.C. § 1391 (b)(1) and (2) because the Plaintiffs and Defendant Letizio are residents of New Hampshire, the Defendant Town of Windham is a New Hampshire municipal corporation, and a substantial part of the events or omissions giving rise to the claims occurred in New Hampshire.

Applicable Statutory and Regulatory Provision

9.      Title II, Part A, of the ADA provides that ". . . no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subject to discrimination by any such entity." 42 U.S.C. § 12132.

10.     A "public entity" includes any "local government." 42 U.S.C. § 12131 (1)(A).

11.     Title IV of the ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. §12203 (a).

12.     Title IV of the ADA provides that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter." 42 U.S.C. §12203 (b).

13.     "No qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity." 28 C.F.R. § 35.130 (a).

14.     "A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability . . . [d]eny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service." 28 C.F.R. § 35.130 (b)(1)(i).

15. "A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability . . . [a]id or perpetuate discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity's program." 28 C.F.R. § 35.130 (b)(1)(v).

16. "A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability." 28 C.F.R. § 35.130 (b)(3)(i).

17. "A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration . . . [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130 (b)(3)(ii).

18. "A public entity may not, in determining the site or location of a facility, make selections . . . [t]hat have the effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to discrimination." 28 C.F.R. § 35.130 (b)(4)(i).

19. "A public entity may not, in determining the site or location of a facility, make selections . . . [t]hat have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities." 28 C.F.R. § 35.130 (b)(4)(ii).

20. "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130 (b)(7)(i).

21.     "No private or public entity shall discriminate against any individual because that individual has opposed any act or practice made unlawful by this part, or because that individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the Act or this part." 28 C.F.R. § 35.134 (a).

22.     "No private or public entity shall coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by the Act or this part." 28 C.F.R. § 35.134 (b).

23.     "A public entity that employs 50 or more persons shall adopt and publish grievance procedures providing for prompt and equitable resolution of complaints alleging any action that would be prohibited by this part." 28 C.F.R. § 35.107 (b).

Facts

24.     C.M., age 6, has a genetic chromosomal disorder known as Trisomy 21 ("Down Syndrome").

25.     As a result, C.M. suffers from a variety of behavioral, cognitive, and neuropsychological problems typical of persons with Down Syndrome.

26.     C.M. can display certain types of behaviors that can pose imminent dangers to his safety. By way of example C.M. can be described as a "Runner" where he impulsively will run down the roadway without the understanding of potential vehicular hazards. He can also wander from his home into the general neighborhood. These are some of the reasons why it is important to have safety warning signs, to alert the motoring public of potential concerns along with speeding in the area.

27. On or about May 22, 2019, the Murrays inquired of the Town regarding the correct process by which traffic signs could be placed on their road to alert the motoring public well in advance of the Murray's residence that there is a special needs resident in the neighborhood.

28. The Murrays were advised by the Town Administrator that there was a process that had to be followed to obtain the requested traffic signs; first, the request would have to be reviewed by the Highway Safety Committee; second, the Highway Safety Committee would make a recommendation to the Board of Selectmen; third, the Selectmen would have to vote to approve the signs; and fourth, assuming the Board of Selectmen voted to approve the signs, the Highway Department would physically install the sign.

29. On May 28, 2019, the Murrays' request for the traffic signs was forwarded to the Highway Safety Committee by the Town Administrator.

30. The Highway Safety Committee consists of various Town Department Heads, including the Chief of Police, Town employees, and local residents.

31. On June 11, 2019, the Highway Safety Committee held a meeting, following which the Highway Safety Committee voted to recommend a "Caution – Special Needs Resident" sign for approval by the Board of Selectmen.

32. In a Memorandum dated June 14, 2019, written on behalf of the Highway Safety Committee, the Chief of Police recommended to the Board of Selectmen that the Murrays' requested sign be approved, in keeping with the Town's past practice of approving such signs.

33. On June 17, 2019, the Board of Selectmen voted to approve the recommendation of the Highway Safety Committee, and approved two (2) signs, one (1) in each direction.

34. By late July/early August, "Special Needs Resident" signs had been installed; the signs did not include the word "Caution," and did not comply with the Manual for Uniform Traffic Control Devices ("MUTCD") in size, shape, or coloration.

35. Shortly thereafter, on August 19, 2019, someone placed a black trash bag over one (1) of the signs; on information and belief, the person who placed the trash bag over the sign was the Defendant Al Letizio, or someone acting on behalf of the Defendant Al Letizio.

36. The sign in question was installed within the public right-of-way near the westerly intersection of West Shore Road and Pine Ridge Road, which location was in front of Mr. Letizio's residence.

37. The sign was placed at the westerly intersection of West Shore Road and Pine Ridge Road on account of a curvature in the road, such that eastbound motorists would be able to see the sign prior to entering the curve, approximately 500 feet before the Murrays' residence.

38. On August 19, 2019, the Murrays complained to the Town Administrator, notifying him that the sign had been covered; on information and belief, defacing and/or obstructing a lawfully erected traffic sign is a violation of applicable state motor vehicle laws and regulations.

39. On information and belief, the Town took no action relative to the violation of the state motor vehicle laws and regulations.

40. During the evening of Friday, August 23, 2019, after regular business hours, the sign was personally removed by the Director of Public Works.

41. On information and belief, the sign was removed as a result of a single informal verbal complaint; on information and belief, no written or formal complaint was ever filed.

42. On information and belief, the complainant was the Defendant, Al Letizio.

43. At no time did the Highway Safety Committee convene a meeting to discuss the removal of the sign, or make any recommendation to the Selectmen regarding the removal of the sign.

44. At no time did the Selectmen convene a meeting to discuss removal of the sign or vote to authorize removal of the sign prior to its removal.

45. On August 26, 2019, the Murrays complained to the Town Administrator regarding removal of the sign, and asked for a meeting with the Board of Selectmen to ask that the sign be reinstalled.

46. At the request of the Murrays, the Board of Selectmen held a hearing on September 9, 2019.

47. Among the issues discussed at the meeting was the reinstallation of the sign, and specifically, that it be reinstalled in the same location; the Murrays specifically requested that the sign be reinstalled in the same location. The Murrays also clarified the fact that the sign had not already been reinstalled was not at their request, contrary to the representations made by the Town Administrator.

48. There was no objection to reinstalling the sign in its original location from any of the persons present at the meeting, including numerous other residents in the neighborhood, as well as, any member of the Board of Selectmen.

49. Nonetheless, the Board of Selectmen did not take a formal vote at the meeting of September 9, 2019; rather, at the suggestion of the Town Administrator, the sign was to be reinstalled in a location to be decided by staff, the Director of Public Works, and the Chief of Police, working together with the Murrays, in close proximity to its original location.

50. On September 10, 2019 the sign was reinstalled, however, the sign was still non-compliant with the MUTCD, the Murrays had not been offered any input into the new location, and in fact,

it had been relocated to a point approximately 250 feet easterly of its original location, after the curve, much closer to the Murrays' residence, in a location obstructed by trees and roadside growth.

51. The Murrays once again requested another meeting with the Board of Selectmen to discuss the location of the sign and to ask for a MUTCD compliant sign to be reinstalled in its original location.

52. The Board of Selectmen originally scheduled a meeting for September 23, 2019, but rescheduled the meeting at the request of the Defendant Al Letizio, to October 21, 2019; no advance notice of the continuation was given to the Murrays, who appeared at the meeting with their legal counsel.

53. At the meeting of October 21, 2019, the Murrays appeared with counsel and a licensed Professional Traffic Operations Engineer, Kim Eric Hazarvartian, Ph.D., P.E., PTOE.

54. The Board of Selectmen refused to allow counsel for the Murrays to discuss the procedural irregularities with regard to how the sign had been removed, or to allow any inquiry into the underlying complaint and the reason why the sign had been removed.

55. Mr. Hazarvartian submitted both written and verbal testimony regarding the type of sign that should be installed and why it should be relocated to its original location; specifically, based on the MUTCD, after a personal inspection of the neighborhood and roadways, it was Mr. Hazarvartian's professional engineering judgment that a MUTCD compliant sign should be relocated to the original location, at the intersection of Pine Ridge Road and West Shore Road.

56. The Board of Selectmen received no evidence regarding the substance of the underlying complaint, or why the sign had been taken down and removed.

57. The Board of Selectmen received no evidence from any other licensed or professional traffic engineer.

58. Mr. Letizio, who appeared at the meeting through counsel, offered no explanation regarding his complaint or why he objected to the sign being put back in its original location; on information and belief, he did not want the sign returned to its original location because of its proximity to his home it because its states "Special Needs Resident."

59. The only evidence received by the Board of Selectmen against relocating the sign to its original location was from the Chief of Police, who indicated that the original location of the sign was too far away from the Murray's residence and so he moved it closer. [1]

60. Mr. Hazarvartian, in response to the question of proximity of the sign to the Murrays' residence, explained to the Board of Selectmen that the sign was placed to protect a segment of the roadway, or a cautionary zone; Mr. Hazarvartian further stated that if there was any question regarding the location of the sign as it relates to the cautionary zone, it would be appropriate to place an additional placard under the warning sign that stated "Next 1000 Feet" or something similar.

61. The Board of Selectmen affirmed the decision of the Chief of Police to relocate the sign, notwithstanding the absence of any explanation for the complaint, the removal of the sign without the Selectmen's prior authorization, the absence of any review or recommendation from the Highway Safety Committee, and contrary to the professional engineering judgment of Mr. Hazarvartian, the only person in attendance at the meeting with the expertise and qualification to make a determination regarding the proper location of the sign.

---

[1] The Chief of Police stated that his decision to move the sign was based on a telephone conversation with someone at the New Hampshire Department of Motor Vehicles. The Chief of Police did not tell the Board of Selectmen that the person with whom he spoke had not performed a field inspection and was not a traffic engineer.

62. In the absence of ADA compliant policies and procedures, including any grievance procedure, the Plaintiffs' commenced this action.

## Claim for Relief

## Violation of the Americans with Disabilities Act

63. The allegations set forth in paragraphs 1 through 62 are herein incorporated by reference.

64. C.M. is a qualified individual with a disability and entitled to the protections of the ADA.

65. The installation of a "caution – special needs resident" sign is a service, program, or activity of a public entity to which C.M. is entitled to the full exercise, enjoyment, and benefit of.

66. The Defendants' actions surrounding the removal and relocation of the sign constitute discrimination in violation of the ADA and its implementing regulations.

67. The Defendant Letizio's placement of a garbage bag over the sign discriminated and interfered with C.M.'s enjoyment and benefit of the sign, in violation of the ADA.

68. The Defendant Letizio's complaint to the Town, causing the removal and relocation of the sign, discriminated and interfered with C.M.'s enjoyment and benefit of the sign, in violation of the ADA.

69. The Defendant Letizio's placement of a garbage bag over the sign violated NH state motor vehicles law; rather than prosecute Mr. Letizio's violation, the Defendant Town removed and relocated the sign at Mr. Letizio's request, in violation of the ADA.

70. The Defendant Town's removal and relocation of the sign denied C.M. the aid, benefit, and service of the sign, in violation of the ADA.

71. The Defendant Town's removal and relocation of the sign, as a result of the Defendant Letizio's complaint, aided and perpetuated discrimination against C.M., by providing significant

assistance to the Defendant Letizio, denying C.M. the aid, benefit, and service of the sign, in violation of the ADA.

72. The Defendant Town, by not observing its established due process in the removal and relocation of the sign, whereby the Highway Safety Committee makes a recommendation to the Board of Selectmen, who in turn would act on the recommendation, but instead, allowed the sign to be removed and relocated at the discretion of various personnel, including the Town Administrator, Chief of Police, and Director of Public Works, utilized criteria or methods of administration that had the effect of subjecting C.M. to discrimination, and defeating or substantially impairing the accomplishment of the objective of the sign with respect to C.M., in violation of the ADA.

73. The Defendant Town, acting through its Selectmen, by upholding the decisions of various personnel to remove and relocate the sign, including the Town Administrator, Chief of Police, and Director of Public Works, without following the Town's established procedure, contrary to the professional engineering judgment Mr. Hazarvartian, and specifically precluding the Plaintiffs from inquiring as to the lack of proper process, or the reasons underlying the removal and relocation of the sign, utilized criteria or methods of administration that had the effect of subjecting C.M. to discrimination, and defeating or substantially impairing the accomplishment of the objective of the sign with respect to C.M., in violation of the ADA.

74. The Defendant Town, in its determination to remove and relocate the sign, selected a location that has the effect of denying C.M. the benefit of the sign, and/or defeating or substantially impairing the accomplishment of the objective of the sign with respect to C.M., in violation of the ADA.

75. The Defendant Town, failed to make reasonable modifications in its polices, practices, or procedures, as necessary to avoid the discriminatory actions resulting in the removal and relocation of the sign, in violation of the ADA.

76. The Defendant Town, acting through its Board of Selectmen, Town Administrator, Chief of Police, and Director of Public Works, together with the Defendant Letizio, discriminated against the Plaintiffs and C.M. because the Plaintiffs opposed the removal and relocation of the sign, and subsequently made charges, testified, assisted or participated in the proceedings before the Town seeking the replacement of the sign in its original location, in violation of the ADA.

77. The Defendant Town, acting through its Board of Selectmen, Town Administrator, Chief of Police, and Director of Public Works, together with the Defendant Letizio, discriminated against the Plaintiffs and C.M. by interfering with the Plaintiffs exercise and enjoyment of the sign, in violation of the ADA.

78. The Defendant Town is a public entity that employs 50 or more persons; the Defendant Town has not adopted ADA compliant procedures, including a grievance procedure providing for prompt and equitable resolution of complaints, in violation of the ADA

**Prayer for Relief**

WHEREFORE, the Plaintiffs, respectfully requests that this Honorable Court:

A. Grant judgment in favor of the Plaintiffs and declare that the Defendants Town and Letizio violated Title II (Part A) and Title V of the ADA and its implementing regulations;

B. Enter a permanent injunction ordering a MUTCD compliant sign be relocated to its original location, and further, enjoin the Defendant Town, acting through its agents, including the Board of Selectmen, Town Administrator, Chief of Police, and Director of Public Works, or in concert

with the Defendant Letizio, from engaging in discrimination against individuals with disabilities in violation of Title II (Part A) and Title V of the ADA and its implementing regulations;

C. Order the Defendant Town to comply with 28 C.F.R. § 35.107 (b) and adopt ADA compliant policies and procedures, including a grievance procedure providing for prompt and equitable resolution of complaints alleging any action that would be prohibited by the ADA;

D. Order the Defendant Town to provide ADA compliance training to its officers and department heads, including Board of Selectmen, Town Administrator, Chief of Police, and Director of Public Works;

E. Enter an award of compensatory and punitive damages to the Plaintiffs, including attorney fees and court costs incurred in this Action; and

F. Grant such further relief as may be just and appropriate.

                                                  Respectfully submitted,
Thomas J. Murray, Jr., and
Lynn M. Murray, on their own behalf,
and on behalf of their minor child, C.M.,
By and through their Attorneys,
TARBELL & BRODICH, P.A.

Dated: January 20, 2020            /s/ David E. LeFevre
                                                  By: David E. LeFevre, Esq. NH Bar #13811
45 Centre Street
Concord, New Hampshire 03301
(603) 226-3900